**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **DEBRA JOYCE CLACKLER, #159516,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **2:06-CV-172-WHA** |
| **GLADYS DEESE, FRANK ALBRIGHT** | ) | |
| **and DR. SAMUEL ENGLEHARDT,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**SPECIAL REPORT, INITIAL DISCLOSURES AND ANSWER
OF DEFENDANT SAMUEL ENGLEHARDT M.D.**

COMES NOW, Defendant DR. SAMUEL ENGLEHARDT ("Dr. Englehardt"), pursuant to this Court's Order dated March 20, 2006, requiring Dr. Englehardt to provide his written Special Report, Initial Disclosures and Answer, and submits the following Special Report, Initial Disclosures and Answer, addressing the allegations asserted by Plaintiff DEBRA JOYCE CLACKLER ("Plaintiff"):

I.    **INITIAL DISCLOSURES**

Dr. Englehardt makes the following initial disclosures as required by this Court's March 20, 2006, Order for Special Report:

A.    The sworn statement of Samuel Englehardt, M.D.;[1]

B.    The sworn statement of Winfred Williams, M.D.;[2] and

---

[1]    A true and correct copy of the affidavit of Samuel Englehardt, M.D. ("Englehardt Affidavit") is attached hereto as **Exhibit A** and incorporated herein by reference.

[2]    A true and correct copy of the affidavit of Winfred Williams, M.D. ("Williams Affidavit") is attached hereto as **Exhibit B** and incorporated herein by reference.

C.    The sworn statement of Laura Strickland, with a true and correct copy of Plaintiff's medical records attached thereto.[3]

## II.    NARRATIVE STATEMENT OF FACTS AND CIRCUMSTANCES MATERIAL TO PLAINTIFF'S COMPLAINT

This action was filed by Plaintiff alleging an array of claims, which maintain that Dr. Englehardt violated her constitutional and civil rights.  (See generally Complaint).  Specifically, Plaintiff alleges Dr. Englehardt ignored or otherwise failed to treat her lipoma, abdominal pain, bowel obstruction, constipation, nausea, vomiting, low heart rate, vaginal pain, irregular menstrual bleeding and failed to perform a mammogram.  (Id.).  As discussed herein, these contentions are frivolous and unfounded.  Dr. Englehardt timely and appropriately treated each and every medical complaint asserted by Plaintiff and assured that Plaintiff did not have any serious medical condition.

### A.    PROCESSES AND PROCEDURES AT TUTWILER

#### 1.    MEDICATION ADMINISTRATION ("PILL CALL") PROCESS

Upon arriving at Tutwiler, inmates are notified of the procedures and processes for obtaining medical care and prescribed medications.  (Strickland Affidavit at ¶ 5).  As part of this orientation process, inmates are provided a form entitled "Access to Health Care Services." (Id.).  When Plaintiff arrived at Tutwiler, she signed the Access to Care Form included in her medical records.  (Id.).  As set forth in the Access to Care Form, inmates receive prescribed medication through the process commonly referred to as "pill call."  (Id.).  Pill call occurs for the general population at Tutwiler (i.e. inmates who are not housed in segregation) every day at 6 a.m. and 6 p.m.  (Id.).  At these designated times, inmates line up outside of two pill call

---

[3]    A true and correct copy of the affidavit of Laura Strickland ("Strickland Affidavit") is attached hereto as **Exhibit C** and incorporated herein by reference.  For purposes of this Special Report and Answer, Dr. Englehardt will cite to and refer to portions of Plaintiff's medical records by Bates-number beginning with the prefix "PHS."

windows outside of the health care unit. (Id.). When the inmate arrives at the pill call window, she provides a member of the medical staff who is standing on the other side of the pill call window with her identification badge which is issued by the Alabama Department of Corrections. (Id.). The member of the medical staff then retrieves the inmate's medication which is organized alphabetically and punches the medication out of a medication blister pack into a small plastic cup. (Id.). The medication is provided to the inmate who is required to immediately take the medication. (Id.). As the pill call process progresses, the medical staff conducting pill call records the disbursement of medication on forms known as "Medication Administration Records" or MARs. (Id.). These MARs are maintained and filed in the individual inmates' medical records. (Id.). Once the medications are dispensed, the medical staff member records the dispensing of medication by placing her initial or initials in the space provided on the corresponding MAR. (Id.). If an inmate does not report to pill call to retrieve her medication, the medical staff member will either (1) leave the form blank, or (2) place the letter "A" in the space provided, indicating the inmate was "absent." (Id.). If the medical staff conducting pill call discovers an inmate's medication has run out, expired or cannot otherwise be dispensed to the inmate, the medical staff at Tutwiler is instructed to document the unavailability of the medication and notify their supervisor or the prescribing physician immediately. (Id.).

## 2.   KEEP ON PERSON ("KOP") MEDICATION PROGRAM

During Plaintiff's incarceration at Tutwiler, Prison Health Services, Inc. ("PHS") and the Alabama Department of Corrections have maintained a "Keep On Person" or KOP Medication Protocol. (Strickland Affidavit at ¶ 6). Under this protocol, eligible inmates receive medication blister packs containing their medication at one time and are then individually responsible for maintaining the medication, not providing the medication to any other inmates and taking the

medications as prescribed. (Id.). Eligible inmates participating in the KOP program are not required to go through the pill call process to obtain their medication. (Id.). The blister packs have designated "reorder rows" which designate when the inmate should notify the medical staff that her medication requires reordering. (Id.). When medication is reordered, the medical staff confirms an inmate's compliance with prescribing physician's orders by checking the remaining blister pack against the inmate's MAR. (Id.). Inmates are only eligible to receive medication via the KOP process if they have historically demonstrated compliance with their medication or if special circumstances demonstrate it would be medically appropriate for an inmate to forego the pill call process. (Id.). A physician in consultation with the medical staff determines if an inmate is eligible to receive medication via the KOP process. (Id.). Eligibility to participate in the KOP program also depends upon the type of medication being prescribed. (Id.). Before an individual is enrolled in the KOP program, she is educated about the KOP process by the physician or a member of the medical staff. (Id.). Once an inmate enrolls in the KOP program, she is responsible for notifying the medical staff when her medication requires reordering. (Id.).

### 3.    SICK CALL PROCESS

When an inmate has a non-emergency medical or health problem and/or complaint at Tutwiler, an inmate may file a sick call request form in order to bring this problem or complaint to the attention of the medical staff and/or request medical treatment for this problem. (Strickland Affidavit at ¶ 7). The sick call request process is well-known at Tutwiler and is utilized by inmates on a daily basis. (Id.). In the Access to Health Care Services Form, inmates are provided a complete description of the sick call process. (Id.). Sick call request forms are available at the Health Care Unit and at various locations throughout the facility. (Id.). An inmate making a sick call request is required to complete the top portion of the sick call request

4

form (stating her name, the date of request, AIS number, date of birth, dorm location, the nature of the problem or request and her signature). (Id.). The inmate then submits the sick call request form by placing it in one of the many locked boxes located throughout the facility. (Id.). The sick call request forms are removed from the locked box each day at approximately 12:00 p.m., brought to the Health Care Unit and marked as received by the medical records clerk or a nurse at that time. (Id.). Upon reviewing the sick call request forms, the medical staff compiles a list of inmates that have submitted sick call request forms and provides the list to the Alabama Department of Corrections officer assigned to the Health Care Unit. (Id.). The Health Care Unit officer summons the patients by radio. (Id.). Sick call occurs at 7:30 a.m. (Id.). Inmates who submit sick call request forms are responsible for reporting to the Health Care Unit for evaluation of their complaints. (Id.). The nurse conducting sick call takes inmates' vital signs and either: (1) provides an inmate with medical treatment that can be provided under the nursing protocols, or (2) refers the inmate to the physician or nurse practitioner on staff at Tutwiler. (Id.). If an inmate submits more than one sick call request form on the same day, the nurse will only fill in the intake information on one sick call request form regarding the inmate's subjective complaints, objective vital signs, assessment and plan. (Id.). A submitted sick call request form that is not completed by PHS's medical staff indicates that an inmate failed to report when summoned to sick call. (Id.). If the medical complaints or problems identified by an inmate in a sick call request form appear to be urgent or life-threatening, the medical staff will immediately have the inmate brought to the Health Care Unit for medical treatment, and the inmate will not be required to wait until sick call begins. (Id.).

### 4.     GRIEVANCE PROCEDURE

PHS has a well-established grievance procedure for any inmate who wishes to voice a complaint regarding any medical treatment she has sought or received during her incarceration at Tutwiler.  (Strickland Affidavit at ¶ 8).  The initial orientation process at Tutwiler also includes educating inmates as to the availability of the grievance process.  (Id.).  The existence of Tutwiler's grievance procedure is well-known among the prison population, as indicated by the fact that Strickland, the Health Services Administrator at Tutwiler, receives inmate requests and/or inmate grievances on a daily basis.  (Id.).  PHS's physicians, nurse practitioners, nurses and other medical personnel attempt to resolve all inmate concerns prior to an "inmate grievance" being submitted.  (Id.).  The grievance process is initiated when an inmate submits a Medical Complaint form to the Health Services Administrator through the institutional mail system.  (Id.).  This request is reviewed by the Health Services Administrator who provides a written response within five days of receipt of the Medical Complaint.  As stated in the Medical Complaint forms, the second step of the grievance process involves the submission of a formal Grievance (also referred to as an "appeal").  (Id.).  Written responses to formal Grievances are provided within five days of receipt.  (Id.).  Medical Complaint and Grievance forms are available from the correctional officers at Tutwiler.  (Id.).  Inmates are instructed to place completed Medical Complaint and Grievance forms in the sick call boxes located throughout the facility.  (Id.).  When received in the health care unit, Medical Complaint and Grievance forms are sent to Strickland by the medical records clerk or administrative assistant.  (Id.).  Strickland reviews the grievances daily, provide a written response within 5 days at the bottom of the form and return a copy of the completed forms to the inmate.  (Id.).  Strickland encourages inmates

who have complaints about the medical care they have sought or received at Tutwiler to utilize this grievance process. (Id.).

### B.    MEDICAL TREATMENT SOUGHT AND/OR RECEIVED BY PLAINTIFF

On Thursday, April 22, 2004, Plaintiff submitted a sick call request form and first complained of pain in her left side. (Englehardt Affidavit at ¶ 4; PHS0172). The following day, Plaintiff was seen by a nurse and scheduled to see a physician. (Id.).

Dr. Englehardt evaluated Plaintiff on Monday, April 26, 2004. (Englehardt Affidavit at ¶ 5; PHS0096; PHS0111).   During Dr. Englehardt's evaluation, Plaintiff claimed to have developed a lump in her left side and stated that she had a pulling sensation in the upper quadrant of her stomach, both of which had caused her pain for several days. (Id.). After a thorough assessment of Plaintiff, Dr. Englehardt determined that she had a lipoma approximately four to five centimeters in diameter. (Id.).

A lipoma is benign tumor composed of mature fat cells, which may occur in any tissue that contains fat. (Englehardt Affidavit at ¶ 6). Lipomas are very common soft tissue lesions and are the most common type of non-cancerous, soft tissue growth. (Id.). The cause of a lipoma is not completely understood, although development of a lipoma appears to be an inherited condition. (Id.). Lipomas are typically: small (a few centimeters in diameter); located beneath the skin; movable; soft and rubbery in consistency; do not cause pain; and remain the same size over years or grow very slowly. (Id.). A lipoma is not a life-threatening condition and no harm will result if a lipoma is left untreated. (Id.). The most bothersome symptom associated with lipoma is the location or increased size that makes the lipoma noticeable by other individuals. (Id.).

Dr. Englehardt determined during his April 26, 2004, evaluation of Plaintiff that her lipoma was not serious or life-threatening and posed no risk to her health; however, Dr. Englehardt made a notation to follow the status of the lipoma and ordered Plaintiff to return for a follow-up examination in four weeks. (Englehardt Affidavit at ¶ 7; PHS0096; PHS0111).

Thereafter, on May 21, 2004, Plaintiff submitted a sick call request form complaining of pain in her left side and stomach, nausea and vomiting. (Englehardt Affidavit at ¶ 8; PHS0170). To treat these symptoms, Dr. Englehardt entered an order for Plaintiff to receive Phenergan (which is used to reduce and/or prevent nausea, vomiting and stomach pains) and clear liquids for twenty-four hours. (Englehardt Affidavit at ¶ 8; PHS0096; PHS0169). Additionally, on May 24, 2004, orders were entered for Plaintiff to receive Tylenol (which is used, among other things, to relieve pain) and Donnatal (which is used to relax the muscles in the bladder and intestines as well as reduce stomach acid but can cause some nausea, vomiting and constipation). (Englehardt Affidavit at ¶ 8; PHS0096).

On May 25, 2004, Plaintiff was seen by a nurse practitioner after complaining of pain in the left quadrant of her abdomen. (Englehardt Affidavit at ¶ 9; PHS0110). The nurse practitioner determined that Plaintiff had low grade gastritis (an inflammation of the stomach causing nausea, pain, vomiting, diarrhea and/or constipation). (Id.). Plaintiff was ordered to continue her prescription of Tylenol and Donnatal and instructed to return to the infirmary as needed. (Id.).

Plaintiff submitted sick call request forms or otherwise visited the infirmary, complaining of abdominal pain, nausea and diarrhea on June 21, 2004, July 14, 2004, and July 16, 2004. (Englehardt Affidavit at ¶ 10; PHS0166; PHS0167; PHS0168). Plaintiff was evaluated and instructed to continue taking Tylenol and Donnatal and encouraged to continue consuming

sufficient fluids. (Id.). Additionally, Plaintiff received a prescription for Zantac (which is used to reduce the amount of acid produced by the stomach). (Id.).

To further treat Plaintiff's complaints, on July 17 and 21, 2004, Dr. Englehardt entered orders for Plaintiff to receive Magnesium Citrate (which is used as a dietary supplement and as a laxative to promote bowel movements), Colace (which is a laxative or stool softener used to promote bowel movements) and Zantac to provide additional relief for her abdominal and stomach pain, nausea and diarrhea and/or constipation. (Englehardt Affidavit at ¶ 11; PHS0095).

Approximately a month later, on August 16, 2004, Plaintiff submitted a sick call request form complaining of constipation, bloating and abdominal pain. (Englehardt Affidavit at ¶ 12; PHS0165). At this time, Plaintiff was prescribed Dulcolax (which is a laxative or stool softener used to promote bowel movements) and Colace. (Id.). Two days later, on August 18, 2004, Plaintiff complained of pains and cramping after eating. (Englehardt Affidavit at ¶ 13; PHS0095; PHS0109). To address these complaints, Dr. Englehardt ordered a test to determine Plaintiff's levels of Amylase and Lipase (fluids which reveal whether an individual has pancreatitis). (Id.). Dr. Englehardt also gave Plaintiff dietary instructions to eat slowly and reduce her intake of carbonated beverages and prescribed her Bentyl (which is used relieve spasms and pains in the gastrointestinal tract—stomach and intestines) and Zantac. (Id.). Additionally, on September 2, 2004, Plaintiff was prescribed Reglan (which is used to reduce and/or prevent nausea). (Englehardt Affidavit at ¶ 14; PHS0095; PHS0108).

On September 5, 2004, Plaintiff submitted a sick call request form complaining of abdominal pain in her left side. At this time, Plaintiff was given a laxative to promote bowel movements and scheduled to see a physician. (Englehardt Affidavit at ¶ 15; PHS0164). On September 6, 2004, Dr. Englehardt entered an order for Plaintiff to receive Dulcolax.

(Englehardt Affidavit at ¶ 15; PHS0094; PHS0108).   On this same day, Dr. Englehardt interpreted the results of Plaintiff's Amylase and Lipase test, which revealed that Plaintiff's levels for each were well within the normal range.  (Englehardt Affidavit at ¶ 16; PHS0108). Additionally, the results of Plaintiff's urine culture and sensitivity test revealed that she had a urinary tract infection.  (Id.).  On September 7, 2004, Dr. Englehardt entered orders for Plaintiff to receive Amoxicillin (an antibiotic used to treat different types of infections) to treat her urinary tract infection.  (Englehardt Affidavit at ¶ 16; PHS0094; PHS0108).  On September 13, 2004, Dr. Englehardt did a follow-up examination of Plaintiff and ordered her to complete her prescription of Amoxicillin (in order to resolve her urinary tract infection) and to see him as needed.  (Englehardt Affidavit at ¶ 17; PHS0108).

Within a week of receiving medications and being examined by Dr. Englehardt, on September 17, 18 and 19, 2004, Plaintiff submitted sick call request forms or otherwise visited the infirmary, complaining of symptoms related to her urinary tract infection.  (Englehardt Affidavit at ¶ 18; PHS0163; PHS0162; PHS0093).  Dr. Englehardt ordered Plaintiff to increase her intake of water and prescribed Pyridium (which is used to relieve pain, burning and discomfort caused by infection or irritation of the urinary tract), Motrin (which is used to reduce fever, pain, inflammation and stiffness caused by various medical conditions) and Macrodantin (which is an antibiotic used to fight bacteria and to treat urinary tract infections) to treat and relieve the discomfort of Plaintiff's urinary tract infection.  (Id.).

Just less than a month later, on October 10, 2004, Plaintiff submitted a sick call request form complaining of pain in her abdomen and constipation.  (Englehardt Affidavit at ¶ 19; PHS0161).  The following day, Dr. Englehardt prescribed Plaintiff Colace and Magnesium

Citrate, to promote bowel movements and relieve any problems Plaintiff was having with constipation. (Englehardt Affidavit at ¶ 19; PHS0092).

On or about October 18, 2004, Plaintiff was transferred to the South Louisiana Correctional Center ("SLCC") where Louisiana Correctional Services, Inc. ("LSC") provided Plaintiff with medical care. (Englehardt Affidavit at ¶ 20; PHS0383; PHS0375; PHS0386; PHS0392). Dr. Englehardt did not order or participate in any way in the transfer of Plaintiff from Tutwiler to SLCC. (Englehardt Affidavit at ¶ 20).

Plaintiff submitted a sick call request form to LSC on November 11, 2004, complaining of pain in her left side; however, when a physician attempted to treat her, Plaintiff refused all medications. (Englehardt Affidavit at ¶ 21; PHS0384). On November 21, 2004, LCS diagnosed Plaintiff as having a lipoma on her left side and, three days later, Plaintiff requested to see an outside doctor to surgically remove her lipoma. (Englehardt Affidavit at ¶ 22; PHS0377; PHS0382).

On or about January 19, 2005, Plaintiff complained of pain in her side and increasing difficulty with bowel movements. (Englehardt Affidavit at ¶ 23; PHS0393). Upon evaluation, Plaintiff's lipoma was stated to be approximately "the size of an orange," and the treating physician recommended surgery to remove the lipoma, as Plaintiff's lipoma had grown during her stay at SLCC. (Id.).

During February and March of 2005, Plaintiff submitted sick call requests forms complaining of pain in her abdomen, constipation and swelling. (Englehardt Affidavit at ¶ 24; PHS0379; PHS0377; PHS0378). On each of these visits, Plaintiff was immediately treated by the attending medical staff and referred to a physician for follow-up examinations. (Id.).

Dr. Englehardt ordered Plaintiff to return from Louisiana on March 18, 2005. (Englehardt Affidavit at ¶ 25; PHS0092). Plaintiff's LCS Medical Transfer Summary indicated that she had a lipoma on her left side and was suffering from constipation, which was being treated with Tagamet (which is used to decrease the amount of acid the stomach produces and treat acid reflux and ulcers), Dulcolax and Colace. (Englehardt Affidavit at ¶ 25; PHS0057). At the time of her transfer from SLCC to Tutwiler, Plaintiff was found to be "stable" and "ok to travel." (Englehardt Affidavit at ¶ 26; PHS0057).

After returning to Tutwiler, on March 26, 2005, Plaintiff submitted a sick call request form complaining of pain in her abdomen and sides and stated that she could not have a bowel movement without the assistance of a laxative and was scheduled to see a physician. (Englehardt Affidavit at ¶ 27; PHS0160). On March 28, 2005, Dr. Englehardt prescribed Plaintiff Metamucil to promote bowel movements. (Englehardt Affidavit at ¶ 27; PHS0091).

On April 4 and 7, 2005, Plaintiff submitted sick call request forms, complaining of pain in her abdomen and requesting a mammogram. (Englehardt Affidavit at ¶ 28; PHS0158; PHS0159). Approximately a week later, on April 12, 2005, John Peasant, M.D. ("Dr. Peasant"), a physician formerly employed at Tutwiler, evaluated Plaintiff. (Englehardt Affidavit at ¶ 28; PHS0091; PHS0109). Dr. Peasant ordered an ultrasound of Plaintiff's abdomen and pelvis and scheduled Plaintiff to have a consultation with Daniel M. Daly, M.D. ("Dr. Daly"), a general surgeon practicing with the Montgomery Surgical Associates, P.A., to evaluate the status of Plaintiff's lipoma and abdominal pain. (Id.). The process of scheduling an inmate for a consultation with a physician (specifically in Plaintiff's situation, a surgeon) located outside of Tutwiler can take several weeks or months. (Englehardt Affidavit at ¶ 28).

Subsequently, Plaintiff continued to complain of abdominal pain, particularly after eating or drinking. (Englehardt Affidavit at ¶ 29; PHS0157). To remedy these pains, Plaintiff was ordered to receive Metamucil. (Englehardt Affidavit at ¶ 29; PHS0090).

Dr. Daly evaluated Plaintiff on May 16, 2005, and confirmed that she had a left flank lipoma that he recommended surgically removing. (Englehardt Affidavit at ¶ 30; PHS0293-0295). Dr. Daly stated that Plaintiff's right-sided abdominal pain originated just above the umbilicus and radiated toward the right abdomen and right flank. (Id.). Dr. Daly further found that Plaintiff had a small, incisional hernia at the bottom of her cholecystectomy scar. (Id.). This scar and corresponding hernia were the result of Plaintiff having a previous surgery to remove her gallbladder in 1988. (Englehardt Affidavit at ¶ 30; PHS0051). Dr. Daly was unable to definitively detect a hernia and stated that he would not explore the area or proceed with a hernia repair, unless Plaintiff developed a clinically detectable hernia. (Englehardt Affidavit at ¶ 30; PHS0293-0295).

The day after her consultation with Dr. Daly, Dr. Englehardt promptly scheduled an appointment for Plaintiff to see Dr. Daly to have her lipoma surgically removed. (Englehardt Affidavit at ¶ 31; PHS0089). During the interim between the scheduling of this appointment and the actual surgery, Plaintiff continued to complain of constipation and abdominal pain. (Englehardt Affidavit at ¶ 31; PHS0155; PHS0156). To relieve these pains, Dr. Englehardt entered orders for Plaintiff to receive Magnesium Citrate and Zantac and to increase her fluid intake. (Englehardt Affidavit at ¶ 31; PHS0087; PHS0088; PHS0156; PHS0155).

On June 16, 2005, Plaintiff submitted a sick call request form complaining of soreness in her breasts and stating that the fibrocystic cysts in her breasts had spread to her underarms. (Englehardt Affidavit at ¶ 32; PHS0153). At this time, Plaintiff was scheduled to see a physician

and have a mammogram. (Id.). On or about June 20, 2005, Dr. Englehardt decided to limit his activities at Tutwiler to gynecological and obstetric care, and Winfred Williams, M.D. ("Dr. Williams") assumed responsibility for the management of all general medical care for inmates at Tutwiler. (Englehardt Affidavit at ¶ 33; Williams Affidavit at ¶ 4). On this same day, Dr. Williams entered orders for Plaintiff to have a mammogram. (Englehardt Affidavit at ¶ 34; Williams Affidavit at ¶ 5; PHS0087).

On Friday, June 24, 2005, Dr. Daly performed outpatient surgery on Plaintiff to remove her lipoma. (Englehardt Affidavit at ¶ 35; Williams Affidavit at ¶ 6; PHS0020; PHS0281). The lipoma was successfully removed, and Plaintiff was prescribed Tylenol for any post-surgical pain and scheduled to have a follow-up evaluation with Dr. Daly in two to three weeks. (Id.). On this same day, once Plaintiff returned to Tutwiler, Dr. Williams admitted Plaintiff to the infirmary to be monitored until she recovered from her surgery. (Englehardt Affidavit at ¶ 36; Williams Affidavit at ¶ 7; PHS0019). Dr. Williams also entered an order for Plaintiff to receive Percogesic (which is used to relive pain). (Id.; PHS0151).

Dr. Williams evaluated Plaintiff on Monday, June 27, 2005, to review the status of her recovery from the surgical removal of her lipoma. (Englehardt Affidavit at ¶ 37; Williams Affidavit at ¶ 8; PHS0010; PHS0073). At this time, Plaintiff indicated that her pain was minimal. (Englehardt Affidavit at ¶ 37; Williams Affidavit at ¶ 8; PHS0010). Dr. Williams prescribed Flagyl (which is an antibiotic used to treat bacteria and infections) and scheduled a follow-up appointment for Plaintiff to be evaluated with Dr. Daly in two weeks. (Id.; PHS0080). On this same day, Dr. Williams scheduled Plaintiff to have a mammogram. (Englehardt Affidavit at ¶ 38; William Affidavit at ¶ 9; PHS0080). After Plaintiff had spent almost a week in the infirmary, on June 29, 2005, she was discharged from the infirmary because the surgical

wound resulting from the removal of her lipoma was healing as expected.  (Englehardt Affidavit at ¶ 39; Williams Affidavit at ¶ 10; PHS0004).  On July 1, 2005, Plaintiff was sent to Elmore Community Hospital to have her scheduled mammogram.  (Englehardt Affidavit at ¶ 40; Williams Affidavit at ¶ 11; PHS0359).  The results of the mammogram indicated that the clusters or masses in Plaintiff's breasts were benign fibrocystic cysts.  (Id.).

Plaintiff returned to Montgomery Surgical Associates, P.A., on July 13, 2005, for her follow-up examination with Dr. Daly.  (Englehardt Affidavit at ¶ 41; Williams Affidavit at ¶ 12; PHS0278; PHS0395).  Dr. Daly evaluated Plaintiff and determined that the surgical wound resulting from the removal of her lipoma was healing nicely, and Plaintiff could resume normal activities.  (Id.).

Approximately a week later, on Thursday, July 21, 2005, Plaintiff submitted a sick call request form complaining of bowel obstruction, abdominal pain, low heart rate, weakness and shortness of breath.  (Englehardt Affidavit at ¶ 42; Williams Affidavit at ¶ 13; PHS0150).  At this time, Plaintiff was scheduled to see a physician.  (Id.).  The following Monday, Dr. Williams evaluated Plaintiff and prescribed Colace, Magnesium Citrate, and Milk of Magnesia (which is a laxative used to promote bowel movements).  (Englehardt Affidavit at ¶ 43; Williams Affidavit at ¶ 14; PHS0086).

On July 29, 2005, Plaintiff again complained of bowel obstruction, pain in her abdomen, inability to have a bowel movement without a laxative, low heart rate and shortness of breath (Englehardt Affidavit at ¶ 44; Williams Affidavit at ¶ 15; PHS0149).  On August 1, 2005, Dr. Williams entered orders for Plaintiff to have a KUB (which is an X-ray of kidneys and bladder) in an effort to help determine the cause of Plaintiff's pain.  (Englehardt Affidavit at ¶ 44; Williams Affidavit at ¶ 15; PHS0086).  The results of the Plaintiff's KUB test indicated that

there was no evidence of any bowel obstruction or unusual intra-abdominal calcifications. (Englehardt Affidavit at ¶ 45; Williams Affidavit at ¶ 16; PHS0358).

From August 12 to August 30, 2005, Plaintiff submitted six sick call request forms complaining of pain in her abdomen, lack of bowel movements absent a laxative, low heart rate and weakness and shortness of breath. (Englehardt Affidavit at ¶ 46; Williams Affidavit at ¶ 17; PHS0143; PHS0144; PHS0145; PHS0146; PHS0147; PHS0148). On each occasion, Plaintiff was evaluated by medical personnel and scheduled to see a physician. (Id.). On September 7, 2005, Dr. Williams entered orders for Plaintiff to have an EKG (which is used to determine the status and function of the heart), the results of which were later determined to be normal. (Englehardt Affidavit at ¶ 46; Williams Affidavit at ¶ 17; PHS0086). The following day, Dr. Englehardt prescribed Plaintiff Phenergan and Provera (the latter of which is used to regulate menstruation) in order to reduce and/or prevent Plaintiff's vaginal bleeding. (Englehardt Affidavit at ¶ 47; Williams Affidavit at ¶ 18; PHS0085). Approximately two weeks later, on September 24, 2005, Plaintiff submitted a sick call request form stating that the Provera stopped her vaginal bleeding temporarily, but the bleeding returned after she stopped taking Provera. (Englehardt Affidavit at ¶ 47; Williams Affidavit at ¶ 18; PHS0142). At this time, Plaintiff was prescribed Motrin and scheduled to see a physician. (Id.).

Dr. Englehardt evaluated Plaintiff for complaints of constipation and pain in the right, upper quadrant of her stomach on October 5 and 21, 2005. (Englehardt Affidavit at ¶ 48; Williams Affidavit at ¶ 19; PHS0085; PHS0107; PHS0140-0141). During these evaluations, Dr. Englehardt conducted a thorough physical examination of Plaintiff, performed a pap smear, extracted a cervical culture and conducted a urine culture and sensitivity test. (Id.). Dr.

Englehardt also entered orders for Plaintiff to receive Milk of Magnesia (Englehardt Affidavit at ¶ 48; Williams Affidavit at ¶ 19; PHS0085; PHS0107).

On November 3, 2005, Dr. Williams evaluated Plaintiff for complaints vaginal bleeding, abdominal pain, cramping and swelling in her abdomen and determined that her pelvis was normal, noted her abdominal hernia (which may have been causing some of her abdominal pain), ordered a liver function test (the results of which were normal) and ordered a follow-up evaluation with Dr. Englehardt to evaluate Plaintiff's perimenopausal (in the middle of menopause) symptoms. (Englehardt Affidavit at ¶ 49; Williams Affidavit at ¶ 20; PHS0071; PHS0085; PHS0106; PHS0305).

Dr. Englehardt evaluated Plaintiff for her complaint of continued vaginal bleeding on November 8, 2005, and determined that Plaintiff's vaginal bleeding was the result of her being in perimenopause. (Englehardt Affidavit at ¶ 50; Williams Affidavit at ¶ 21; PHS0085; PHS0105). Dr. Englehardt ordered Plaintiff to receive a pelvic ultrasound, after which consideration of D&C (scraping of the inner-lining of the uterus) could be entertained. (Id.). Additionally, Dr. Englehardt prescribed Provera to control Plaintiff's vaginal bleeding. (Id.).

Approximately a month later, on December 1, 2005, Plaintiff submitted a sick call request form, complaining of abdominal and back pain. (Englehardt Affidavit at ¶ 51; Williams Affidavit at ¶ 22; PHS0137). Plaintiff was scheduled to be evaluated by a physician and undergo her scheduled ultrasound. (Id.). A pelvic ultrasound of Plaintiff was conducted on December 6, 2005, which indicated that she had a fibroid uterus (which can cause vaginal bleeding). (Englehardt Affidavit at ¶ 51; Williams Affidavit at ¶ 22; PHS0357).

On December 25 and 27, 2005, Plaintiff submitted sick call request forms, complaining of abdominal and back pains, constipation, vomiting and swelling. (Englehardt Affidavit at ¶ 52;

Williams Affidavit at ¶ 23; PHS0134-0136).  The same week Plaintiff asserted her complaints, on December 30, 2005, Dr. Englehardt conducted an evaluation of Plaintiff.  (Englehardt Affidavit at ¶ 53; Williams Affidavit at ¶ 24; PHS0070; PHS0084).  Plaintiff indicated that she had two normal menstrual cycles, indicating that the Provera was working.  (Id.).  At this time, Dr. Englehardt prescribed Plaintiff Metamucil in order to promote bowel movements and relieve any problems she may be having with constipation.  (Id.).

On January 12 and 14, 2006, Plaintiff submitted a sick call request form complaining of abdominal and back pain, vaginal pain, nausea and vomiting. (Englehardt Affidavit at ¶ 54; Williams Affidavit at ¶ 25; PHS0130-0133).  Dr. Englehardt evaluated Plaintiff on January 18, 2006, and continued her prescriptions of Provera and Zantac.  (Englehardt Affidavit at ¶ 54; Williams Affidavit at ¶ 25; PHS0083).

Approximately two weeks later, on January 31, 2006, Dr. Englehardt determined that Plaintiff had an ulcer and prescribed her Dulcolax, Tums and Gas-Ex to relieve her abdominal pain.  (Englehardt Affidavit at ¶ 54; Williams Affidavit at ¶ 26; PHS0083; PHS0104).  On this same day, Plaintiff tested positive for H. Pylori (an infection in the intestines).  (Id.; PHS0304).  However, the results of this test were later determined to be a false-positive test result. (Englehardt Affidavit at ¶ 55; Williams Affidavit at ¶ 26).  A false-positive test result is one that appears to detect a disease or condition when in fact it is not present. (Id.).

On February 2, 2006, Dr. Englehardt evaluated Plaintiff and prescribed Flagyl and Tetracycline (which is an antibiotic used to fight bacteria and infections) to treat Plaintiff's presumed ulcer.  (Englehardt Affidavit at ¶ 56; Williams Affidavit at ¶ 27; PHS0083).  Around on week later, on February 9 and 11, 2006, Plaintiff submitted sick call request forms, complaining of abdominal and back pain, swelling, nausea, vomiting and constipation.

(Englehardt Affidavit at ¶ 57; Williams Affidavit at ¶ 28; PHS0127; PHS0128). At this time, Plaintiff was given Maalox and Pepto Bismol. (Englehardt Affidavit at ¶ 57; Williams Affidavit at ¶ 28; PHS0127; PHS0083). Dr. Englehardt ordered Plaintiff to continue taking Tetracycline and Flagyl, on February 13, 2006, and entered Plaintiff a prescription for Prilosec (which is used to reduce the amount of acid produced by the stomach), educated Plaintiff concerning her diet and scheduled Plaintiff to be evaluated by Dr. Williams for her ulcer. (Englehardt Affidavit at ¶ 58; Williams Affidavit at ¶ 29; PHS0067-0068; PHS0082-0083).

Plaintiff was evaluated by Dr. Williams on February 14, 2006, who adjusted Plaintiff's diet and continued her prescription for Prilosec. (Englehardt Affidavit at ¶ 59; Williams Affidavit at ¶ 30; PHS0066; PHS0081). Subsequently, on February 22, 2006, March 9, 2006 and March 14, 2006, Plaintiff submitted sick call request forms complaining of abdominal and back pain and was subsequently evaluated and treated by Dr. Williams. (Englehardt Affidavit at ¶ 60; Williams Affidavit at ¶ 31; PHS0120-0125). To treat these and related symptoms, on March 20, 2006, Dr. Williams ordered Plaintiff to continue taking Flagyl and other acid suppressing medications. (Englehardt Affidavit at ¶ 61; Williams Affidavit at ¶ 32; PHS0081; PHS0103). Additionally, Dr. Williams prescribed Amoxicillin. (Id.).

In summation, Plaintiff has chronic constipation with laxative dependency. Plaintiff has never presented an "acute abdomen" (a sudden onset of intense abdominal pain) and has never been diagnosed with or treated for any type of bowel obstruction or any emergency situation regarding her gastrointestinal tract or bowel function. (Englehardt Affidavit at ¶ 62).

Dr. Englehardt and Williams responded timely and appropriately to all of Plaintiff's written requests for medical treatment. (Englehardt Affidavit at ¶ 63; Williams Affidavit at ¶ 33). Dr. Englehardt and Williams' decisions regarding Plaintiff's medical treatment were based on

their medical judgment at that time.   (Id.).   Neither Dr. Englehardt nor Williams refused to provide Plaintiff with medical treatment nor did they ignore any of her complaints.   (Id.).

### C.    PLAINTIFF'S GRIEVANCES

During the time from April 6, 2004, Plaintiff filed four Medical Complaints or informal grievances, complaining of many of the same complaints set forth in Plaintiff's Complaint. (Strickland Affidavit at ¶ 9; PHS0368; PHS0369; PHS0370; PHS0140-0141).   Responses to Plaintiff's grievances were provided in a timely manner.   (Strickland Affidavit at   ¶ 9; PHS0367; PHS0368; PHS0369; PHS0370; PHS0371).   Plaintiff did not submit any appeal after receiving a response to any Medical Complaint she filed during her incarceration at Tutwiler.   (Strickland Affidavit at ¶ 9).

## III.    DISCUSSION

Plaintiff's Complaint is based entirely upon her disagreement with the course of treatment prescribed for her and made available to her by Dr. Englehardt. (See Complaint). Plaintiff's Complaint does not claim Plaintiff did not receive any treatment for her arthritic condition.  Plaintiff's Complaint does not allege Dr. Englehardt refused to provide her with any necessary medical treatment.  Plaintiff simply claims that she was dissatisfied with the specific treatment prescribed for her and the manner in which such treatment was provided.  For these reasons and the reasons stated below, Plaintiff's Complaint does not state a claim against Dr. Englehardt.  Even if Plaintiff's Complaint did state a claim against Dr. Englehardt, such claims are precluded by physical injury and exhaustion requirements of the Prison Litigation Reform Act, 42 U.S.C. §1997e.

A.    THE COMPLAINT FAILS TO STATE ANY CLAIM AGAINST DR. ENGLEHARDT FOR ANY ALLEGED VIOLATION OF PLAINTIFF'S EIGHTH AMENDMENT RIGHTS.

Plaintiff's Complaint alleges that Dr. Englehardt acted with deliberate indifference and violated her civil and constitutional rights with respect to the medical treatment provided to her by Dr. Englehardt during her incarceration at Tutwiler from April 6, 2004, to the present date. (See generally Complaint).  By virtue of this language, Plaintiff acknowledges her claims rely exclusively upon the rights afforded her under the Eighth Amendment. (Id.).  The Eighth Amendment[4] does not on its face reference in any way any medical care due to incarcerated persons. See e.g. Marsh v. Butler County, Ala., 268 F.3d 1014, 1038 (11th Cir. 2001)(en banc). In Estelle v. Gamble, 429 U.S. 97 (1976), the United States  Supreme Court first inferred a prisoner's "right" to necessary medical care from the text of the Eighth Amendment.  In reaching this conclusion, the Estelle Court held that the prohibition against cruel and unusual punishment in the Eighth Amendment prohibits prison officials from acting with "deliberate indifference" with regard to prisoners' serious medical needs. 429 U.S. at 104.  Since Estelle, courts have routinely recognized that the Eighth Amendment[5] to the United States Constitution governs the conditions of confinement for prisoners and the treatment of these prisoners during the term of their incarceration.  Farmer v. Brennan, 511 U.S. 825, 832 (1994) (quoting Helling v. McKinney, 509 U.S. 25, 31 (1993)); see also Whitley v. Albers, 475 U.S. 312, 327 (1986); Rhodes v. Chapman, 452 U.S. 337, 345-46 (1981).

---

[4]    The Eighth Amendment applies to the states by virtue of the Fourteenth Amendment's Due Process Clause. Robinson v. California, 370 U.S. 660, 666 (1962).

[5]    Though liability arising out of the treatment of pretrial detainees triggers Fourteenth Amendment considerations, "the minimum standard for providing medical care to a pre-trial detainee under the Fourteenth Amendment is the same as the minimum standard required by the Eighth Amendment for a convicted prisoner . . ." See Hamm v. DeKalb County, 774 F.2d 1567, 1573-74 (11th Cir. 1985).  To the extent Dr. Englehardt relies upon any cases addressing the application of the Fourteenth Amendment in the prison context, such cases are equally applicable in this case.

An alleged claim of "deliberate indifference" under the Eighth Amendment may be actionable under 42 U.S.C. § 1983.[6] <u>See</u> <u>Graham v. Connor</u>, 490 U.S. 386, 393- 94 (1989)(recognizing that § 1983 is not a source of "any substantive right," but rather provides a means for "vindicating federal rights elsewhere conferred.").  Every claim by a prisoner that he has not received adequate medical treatment does not state a violation of the Eighth Amendment. <u>McElligott v. Foley</u>, 182 F.3d 1248, 1254 (11th Cir. 1999).    Courts have devoted an extraordinary amount of time clearly defining the requirements for asserting and succeeding upon an Eighth Amendment claim under § 1983.  Both the Supreme Court and Eleventh Circuit have described the Eighth Amendment standard of deliberate indifference as requiring allegations and evidence of both "objective" and "subjective" components. <u>See e.g.</u> <u>Farmer</u>, 511 U.S. 825 at 834, 837; <u>Chandler v. Crosby</u>, 379 F.3d 1278, 1289-90 (11th Cir. 2004).

The "objective" component of the Eighth Amendment analysis requires a prisoner to demonstrate the existence of a condition, act or omission which is sufficiently egregious to violate the Eighth Amendment.  <u>See</u> <u>Hudson v. McMillian</u>, 503 U.S. 1, 8 (1992).  The underlying conduct or condition must be "extreme" and pose "an unreasonable risk of serious damage to his future health," if left unchecked. <u>Chandler</u>, 379 F.3d at 1289-90 (quoting <u>Hudson</u>, 503 U.S. at 9) (other citations omitted).  At a minimum, a prisoner must allege and establish the existence of "a serious medical need." <u>Chandler</u>, 379 F.3d at 1289-90; <u>Farrow v. West</u>, 320 F.3d 1235, 1243 (11th Cir. 2003).  The Eleventh Circuit's long-standing definition of "serious medical need" is a condition "that has been diagnosed by a physician as mandating treatment or one that is so

---

[6]    42 U.S.C. § 1983 provides, in pertinent part,

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivations of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceedings for redress . . . .

obvious that even a lay person would easily recognize the necessity for a doctor's attention." <u>See</u> <u>e.g.</u> <u>Farrow</u>, 320 F.3d at 1243 (citing <u>Hill v. DeKalb Reg'l Youth Det. Ctr.</u>, 40 F.3d 1176, 1187 (11th Cir. 1994) (internal quotations omitted)).   Additionally, the serious medical need must be such that, if left untreated, "pos[es] a substantial risk of serious harm." <u>Farmer</u>, 511 U.S. at 834. The burden falls squarely upon Plaintiff to allege and ultimately establish the existence of a serious medical need.   <u>See e.g.</u> <u>Hamm v. DeKalb County</u>, 774 F.2d 1567 (11th Cir. 1985).

If Plaintiff successfully identifies and establishes the existence of a "serious medical need," she must also establish the "subjective" component of an Eighth Amendment violation. Plaintiff must prove that Dr. Englehardt acted with "deliberate indifference." <u>See e.g.</u> <u>Farmer</u>, 511 U.S. at 837.   This subjective component requires evidence that Dr. Englehardt possessed actual knowledge of "an excessive risk to inmate health or safety" and disregarded that risk. <u>Id.</u> at 837.   Evidence demonstrating that Dr. Englehardt failed "to alleviate a significant risk that [they] should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment" or serve as a basis for a claim of deliberate indifference. <u>Campbell v. Sikes</u>, 169 F.3d 1353, 1363-1364 (11th Cir. 1999)(other citations omitted); <u>see also</u> <u>Cottrell v. Caldwell</u>, 85 F.3d 1480, 1491 (11th Cir.1996) (holding, "[t]here is no liability for 'an official's failure to alleviate a significant risk that he should have perceived but did not ....'" (quoting <u>Farmer</u>, 511 U.S. at 838)). Courts summarize this component as requiring evidence of a "subjectively sufficiently culpable state of mind." <u>Id.</u> at 1491 (other citations and internal quotations omitted).

It is incumbent upon a prisoner asserting a § 1983 claim to establish "conscious or callous indifference" on the part of the prison official.   <u>See e.g.</u> <u>Daniels v. Williams</u>, 474 U.S. 327 (1986); <u>Brown v. Hughes</u>, 894 F.2d 1533, 1537-38 (11th Cir. 1990).   For example, a

prisoner's § 1983 claim for inadequate medical treatment cannot survive summary judgment unless and until the inmate produces evidence "of the prison official's subjective awareness" of the alleged medical condition and an "intentional refusal [by the official] to provide . . . care." Id.; Campbell v. Sikes, 169 F.3d 1353, 1364 (11th Cir. 1999) (quoting Steele v. Shah, 87 F.3d 1266, 1269 (11th Cir. 1996)); Hill, 40 F.3d at 1186). Without evidence of this "specific intent," a prisoner's § 1983 claim cannot succeed. Steele, 87 F.3d at 1269.

Courts have devoted a significant amount of time identifying the specific types of allegations which do *not* give rise to the claim of "deliberate indifference." In declaring the "deliberate indifference" standard for the first time, the Estelle Court wrote, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." 429 U.S. at 106. The Eleventh Circuit in Chandler held a prisoner's discomfort does not give rise to an Eighth Amendment violation. 379 F.3d at 1295 (citations omitted). Applying Estelle, the Eleventh Circuit also noted that a complaint that prison medical staff should have done more to diagnose and/or treat a prisoner is "at most . . . medical malpractice." Campbell, 169 F.3d at 1363. Indeed, the Eighth Amendment does not prohibit or provide any remedy for any "accidental inadequacy . . . or even medical malpractice actionable under state law." Taylor v. Adams, 221 F.3d 1254, 1258 (11th Cir. 2000) (quotations and citation omitted). For this reason, medical decisions not to provide certain types of medical treatment, such as an x-ray, are not actionable as a matter of law under the Eighth Amendment. Id.

The first broad category of cases in which courts have historically mandated limitations upon the liability of prison officials under the Eighth Amendment constitute cases of alleged delayed medical treatment. In cases when a prisoner actually receives medical treatment, courts

employ an altered analysis of deliberate indifference.  As to claims of delayed medical treatment, the Eleventh Circuit has instructed courts to be hesitant to find an Eighth Amendment violation when officials provide medical care to prison inmates.  McElligott, 182 F.3d at 1259 (11th Cir. 1999) (citing Waldrup v. Evans, 871 F.2d 1030, 1035 (11th Cir. 1989)).  In fact, a prisoner alleging delayed medical treatment must show that the official acted with deliberate indifference, meaning the official knew of the serious medical condition and "intentionally or with reckless disregarded, delayed treatment."  Hinson v. Edmond, 192 F.3d 1342, 1348 (11th Cir. 1999).  In Hill, the Eleventh Circuit added:

> Cases stating a constitutional claim for immediate or emergency medical attention have concerned medical needs that are obvious even to a lay person because they involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem.  In contrast, *delay or even denial of medical treatment for superficial, nonserious physical conditions does not constitute an Eighth Amendment violation*. * * * Consequently, delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the condition, and considering the reason for the delay.

40 F.3d 1176, 1188-89 (11th Cir. 1994) (emphasis added).  Hence, whether a claim arises from delayed treatment depends upon "the nature of the medical need and the reason for the delay."  Harris v. Coweta County, 21 F.3d 388, 393-94 (11th Cir. 1994).

Like cases involving claims of delayed medical treatment, courts have applied an altered analysis of claims involving requests for different or alternative types of medical treatment. When an inmate claims "different treatment should have been provided," such a claim "is tantamount to a medical judgment call," not an Eighth Amendment violation. McElligott, 182 F.3d at 1259.  In greater detail, the Eleventh Circuit explained in Hamm:

> Although Hamm may have desired different modes of treatment, the care the jail provided did not amount to deliberate indifference. See Bass v. Sullivan, 550 F.2d 229, 231-32 (5th Cir.), cert. denied, 434 U.S. 864, 98 S.Ct. 195, 54 L.Ed.2d 138 (1977); accord, Westlake v. Lucas, 537 F.2d 857, 860 n. 5 (1st Cir. 1981) (***"Where a prisoner has received ... medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in tort law."***).

774 F.2d at 1575 (emphasis added). Accordingly, in instances where prisoners complain of delays in medical treatment or request different medical treatment, prisoners must overcome a much greater threshold in order to state and/or succeed upon such a §1983 claim.

Plaintiff's Complaint includes a myriad of allegations against Dr. Englehardt, which can be summarized as follows:

(1)    Dr. Englehardt allegedly "exercised deliberate indifference when he ignored [Plaintiff's] lipoma . . . . and abdominal pain" (Complaint at pp. 2-3);

(2)    Dr. Englehardt allegedly "exercised deliberate indifference when he ignored [Plaintiff's] bowel obstruction . . . . abdominal pain, constipation, nausea and vomiting." (Complaint at pp. 2-3);

(3)    Dr. Englehardt allegedly "exercised deliberate indifference when he ignored [Plaintiff's] low heart rate . . . ." (Complaint at p. 2);

(4)    Dr. Englehardt allegedly failed to evaluate Plaintiff's vaginal pain and treat her irregular menstrual bleeding (Complaint at pp. 4-7); and

(5)    Dr. Englehardt allegedly failed to schedule and perform a mammogram to evaluate Plaintiff's breasts (Complaint at pp. 4-6).

As discussed in greater detail below, Plaintiff's Complaint against Dr. Englehardt fails to provide any grounds upon which she can state any alleged violation of her constitutional rights.

### 1.   PLAINTIFF RECEIVED MEDICAL TREATMENT FOR HER LIPOMA.

A previously stated, a lipoma is a benign, non-life threatening tumor that will result in no harm if it is left untreated. (Englehardt Affidavit at ¶ 6). The most bothersome symptom of a lipoma is the location or increased size that makes it noticeable by other individuals. (Id.). Dr. Englehardt first diagnosed Plaintiff as having a lipoma on April 26, 2004, and determined that Plaintiff's lipoma was not serious or life-threatening and posed no risk to her health. (Id. at ¶¶ 5, 7; PHS0096; PHS0111). Throughout the following months, Dr. Englehardt continually monitored the status of Plaintiff's lipoma. (Id. at ¶¶ 7-22).

On November 24, 2004, while incarcerated at SLCC and under the care of LSC, Plaintiff requested that her lipoma be surgically removed by a physician located outside of SLCC. (Id. at ¶ 22, PHS0382). After Plaintiff returned to Tutwiler from SLCC, on April 12, 2005, Plaintiff had an ultrasound of her abdomen and pelvis and was scheduled to have a consultation with Dr. Daly, a general surgeon located outside of Tutwiler to determine the status of Plaintiff's lipoma. (Id. at ¶ 28; PHS0091; PHS0109). On May 16, 2005, Dr. Daly evaluated Plaintiff and recommended the surgical removal of her lipoma. (Id. at ¶ 30; PHS0293-0295). Dr. Daly also discovered a small, incisional hernia and scar tissue that was the result of Plaintiff's gallbladder surgery in 1988; however, Dr. Daly stated that the hernia was not clinically detectable and no hernia repair was necessary. (Id.; PHS0051). The following day, Dr. Englehardt scheduled Plaintiff to have her lipoma surgically removed by Dr. Daly. (Id. at ¶ 31; PHS0089).

Dr. Daly performed outpatient surgery on Plaintiff on June 24, 2005, and successfully removed her lipoma. (Id. at ¶ 35; Williams Affidavit at ¶ 6; PHS0020; PHS0281). After her surgery, Plaintiff was given medications for pain and to prevent infections and was admitted to the infirmary for almost a week, to be closely monitored by attending physicians and medical

personnel, until she was released because her lipoma was healing as expected and she was in minimal pain. (Englehardt Affidavit at ¶¶ 36-39; Williams Affidavit at ¶¶ 7-10; PHS0019; PHS0151; PHS0010; PHS0073; PHS0080; PHS0004). Plaintiff was also scheduled for a follow-up appointment with Dr. Daly. (Englehardt Affidavit at ¶ 37; Williams Affidavit at ¶ 8; PHS0080). At Plaintiff's July 13, 2005, follow-up visit with Dr. Daly, Dr. Daly stated that the surgical wound was healing nicely, and Plaintiff could resume normal activities. (Englehardt Affidavit at ¶ 41; Williams Affidavit at ¶ 12; PHS0278; PHS0395).

The foregoing statement of the treatment Plaintiff received for her lipoma evidences that Dr. Englehardt did not act with deliberate indifference to any serious medical need of Plaintiff which posed a substantial risk to her health. Farmer, 511 U.S. at 834. Even if this could be shown, though it clearly cannot, Plaintiff cannot show that Dr. Englehardt possessed actual knowledge of an excessive risk to Plaintiff's health or safety. To the contrary, Dr. Englehardt stated, and Plaintiff's medical records reflect, that Dr. Englehardt responded timely and appropriately to all of Plaintiff's requests for medical treatment and did not ignore or fail to provide Plaintiff with medical care. (Englehardt Affidavit at ¶ 63).

2.    **PLAINTIFF RECEIVED MEDICAL TREATMENT FOR ABDOMINAL PAIN, CONSTIPATION, NAUSEA AND VOMITING AND HAS NEVER BEEN DIAGNOSED WITH OR TREATED FOR ANY BOWEL OBSTRUCTION.**

Plaintiff's abdominal pains may have been caused as a result of her diagnosis with low grade gastritis (an inflammation of the stomach causing nausea, pain, vomiting, diarrhea and/or constipation) (Englehardt Affidavit at ¶ 9; PHS0110); a small, incisional hernia that resulted after Plaintiff's previous surgery to remove her gallbladder in 1998 but which is not clinically detectable (Englehardt Affidavit at ¶¶ 30, 49; Williams Affidavit at ¶ 20; PHS0051; PHS0085;

PHS0160; PHS0305); or an ulcer (Englehardt Affidavit at ¶ 55; Williams Affidavit at ¶ 26; PHS0083; PHS0104).

Plaintiff has chronic constipation with laxative dependency. (Englehardt Affidavit at ¶ 62). Plaintiff has never presented an "acute abdomen" (a sudden onset of intense abdominal pain) and has never been diagnosed with or treated for any type of bowel obstruction or any emergency situation regarding her gastrointestinal tract or bowel function. (Id.). Further, Plaintiff's the results of Plaintiff's KUB test, indicated that Plaintiff did not have any signs of a bowel obstruction or any unusual intra-abdominal calcifications. (Englehardt Affidavit at ¶ 45; Williams Affidavit at ¶ 16; PHS0358).

In order to treat Plaintiff's low grade gastritis, constipation, nausea, vomiting, and ulcer, Plaintiff has been prescribed numerous medications, including but not limited to: Phenergan, Tylenol, Donnatal, Zantac, Magnesium Citrate, Colace, Dulcolax, Bentyl, Reglan, Motrin, Tagamet, Percogesic, Milk of Magnesia, Flagyl, Tetracycline, Tums, Gas-X, Maalox and Pepto Bismol. (See generally Englehardt Affidavit; Williams Affidavit; Medical Records). In addition, Plaintiff has been advised to increase her intake of fluids and has been educated concerning dietary modifications. (Id.).

Given the extensive amount of treatment Plaintiff has received to treat the aforementioned complaints, it is readily apparent that Dr. Englehardt has not acted with deliberately indifferent to any serious medical need of or that Dr. Englehardt possessed actual knowledge of an excessive risk to Plaintiff's health or safety. Rather, Dr. Englehardt responded timely and appropriately to all of Plaintiff's requests for medical treatment and did not ignore or fail to provide Plaintiff with medical care. (Englehardt Affidavit at ¶ 63).

###     3.    PLAINTIFF HAS NOT BEEN DIAGNOSED WITH A LOW
####          HEART RATE.

Plaintiff complains of having a low heart rate; however, Plaintiff has never been diagnosed with or showed symptoms indicating that she had a low heart rate.  In fact, a recent test of Plaintiff's heart rate indicated that the status and function of her heart were normal. (Englehardt Affidavit at ¶ 46; Williams Affidavit at ¶ 17; PHS0086).

In the absence of any evidence indicating that Plaintiff has a low heart rate or that Dr. Englehardt has failed to treat any alleged heart condition of Plaintiff, Dr. Englehardt cannot be said to have acted deliberately indifferent to any serious medical need of Plaintiff or to have possessed actual knowledge of a an excessive risk to Plaintiff's health or safety.

###     4.    PLAINTIFF HAS RECEIVED MEDICAL TREATMENT
####          FOR HER VAGINAL PAIN AND IRREGULAR VAGINAL
####          BLEEDING.

Plaintiff's irregular vaginal bleeding has been the result of Plaintiff's urinary tract infection and the fact that Plaintiff is perimenopausal (in the middle of menopause).  (Englehardt Affidavit at ¶ 16, 49; Williams Affidavit at ¶ 20).

Dr. Englehardt conducted urine culture and sensitivity tests, which revealed Plaintiff's urinary tract infection.  (Englehardt Affidavit at ¶ 16).  Once Plaintiff's urinary tract infection was discovered, Dr. Englehardt immediately prescribed Plaintiff Amoxicillin (Id.; PHS0094; PHS0108).  Subsequently, Plaintiff was prescribed Pyridium, Motrin and Macrodantin to treat her urinary tract infection.  (Id. at ¶ 18; PHS0162-0163; PHS0093).  Plaintiff was also advised to increase her consumption of water.  (Id.).  Based on the information contained in Plaintiff's medical records, Plaintiff's urinary tract infection was treated and is no longer a problem.

On November 3, 2005, Plaintiff began complaining of perimenopausal symptoms, including: swelling, cramping and irregular vaginal bleeding.  (Englehardt Affidavit at ¶ 49;

Williams Affidavit at ¶ 20; PHS0071).  Plaintiff later had a pelvic ultrasound, which revealed that she had a fibroid uterus (which can cause vaginal bleeding).  (Englehardt Affidavit at ¶ 51; Williams Affidavit at ¶ 22; PHS0357).  In order to treat the irregular vaginal bleeding caused by these conditions, Plaintiff was prescribed Provera.  (Englehardt Affidavit ¶ 50; Williams Affidavit at ¶ 21; PHS0085; PHS0105).  Since being prescribed Provera, Plaintiff has had normal menstrual cycles, indicating that the Provera is working and regulating Plaintiff's perimenopausal symptoms and irregular vaginal bleeding.  (Englehardt Affidavit at ¶ 53; Williams Affidavit at ¶ 24).

Based on the foregoing facts, Plaintiff's allegations that Dr. Englehardt acted with deliberate indifference to any serious medical need of Plaintiff or that Dr. Englehardt possessed actual knowledge of a an excessive risk to Plaintiff's health or safety are completely without merit.   Dr. Englehardt responded timely and appropriately to all of Plaintiff's requests for medical treatment and did not ignore or fail to provide Plaintiff with medical care.  (Englehardt Affidavit at ¶ 63).  Additionally, Plaintiff's medical records indicate that that the medications prescribed to treat Plaintiff's irregular vaginal bleeding were effective and continue to be effective in remedying this problem.  (See generally Englehardt Affidavit; Williams Affidavit; Medical Records).

### 5.    PLAINTIFF HAS RECEIVED A MAMMOGRAM TO EVALUATE THE CLUSTERS IN HER BREASTS.

On April 4, 2005, Plaintiff first requested a mammogram.  (Englehardt Affidavit at ¶ 28; PHS0159).   On June 16, 2005, Plaintiff was scheduled to see a physician and have a mammogram.  (Englehardt Affidavit at ¶ 32; PHS0153).  On June 20, 2005, Dr. Williams evaluated Plaintiff and entered orders for her to receive mammogram.  (Englehardt Affidavit at ¶ 34; Williams Affidavit at ¶ 5; PHS0087).  On July 1, 2005, Plaintiff was sent to Elmore

Community Hospital to have her scheduled mammogram.  (Englehardt Affidavit at ¶ 40; Williams Affidavit at ¶ 11; PHS0359).  The results of the mammogram indicated that the clusters or masses in Plaintiff's breasts were benign fibrocystic cysts.  (Id.).

Less than three months after Plaintiff's initial request for a mammogram, she was sent outside of Tutwiler to have a mammogram, the results of which indicate that Plaintiff has benign (non-cancerous) fibrocystic cysts in her breasts.  Based on the actions taken by Dr. Englehardt, it is readily apparent that a timely and appropriate response was given to Plaintiff's requests for a mammogram and Dr. Englehardt did not ignore or fail to provide Plaintiff with medical care. (Englehardt Affidavit at ¶ 63).

Additionally, Plaintiff's mammogram revealed that Plaintiff does not have a serious medical need, but rather, benign fibrocystic cysts, which are non-cancerous.  (Englehardt Affidavit at ¶ 32; PHS0153).  Therefore, Plaintiff's allegations that Dr. Englehardt acted with deliberate indifference to Plaintiff's serious medical need or that Dr. Englehardt possessed actual knowledge of a an excessive risk to Plaintiff's health or safety are completely are utterly and completely without merit.

**B.    PLAINTIFF'S COMPLAINT IS BARRED BY THE PRISON LITIGATION REFORM ACT.**

**1.    PLAINTIFF FAILS TO IDENTIFY ANY PHYSICAL INJURY SUFFERED BY HER.**

42 U.S.C. § 1997e(e) provides, "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."  The Eleventh Circuit wrote in Napier v. Preslicka, "This statute is intended to reduce the number of frivolous cases filed by imprisoned plaintiffs, who have little to lose and excessive amounts of free time with which to pursue their complaints." 314 F.3d 528, 532 (11th Cir. 2002)(citing Harris v. Garner, 216 F.3d

970, 976-979 (11th Cir. 2000)(*en banc*)).  When an inmate characterizes his claims for "mental and emotional injury[,] . . .  he [does] not allege physical injury [and] . . . is not entitled to compensatory relief." Boxer X v. Donald, 2006 WL 463243, *2 (11th Cir. 2006)(*slip opinion*); see also Hughes v. Lott, 350 F.3d 1157, 1159 (11th Cir. 2003)(holding  claims for "mental anguish, humiliation and emotional distress . . . were barred under 42 U.S.C. § 1997e(e)."); Mitchell v. Brown & Williamson Tobacco Corp., 294 F.3d 1309, 1312-1313 (11th Cir. 2002)(concluding, "a prisoner's claims for emotional or mental injury must be accompanied by allegations of physical injuries that are greater than de minimis." (other citations omitted)). Hence, an inmate's § 1983 claim is barred by § 1997e(e) to the extent her complaint is based upon any mental or emotional injury.

On the signature page of her Complaint, Plaintiff describes the "relief" requested in this matter, writing Plaintiff "pray[s] that the court will grant compensation for my pain and suffering, ***mental and emotional anguish*** . . . ."  (Complaint at p. 7) (emphasis added).  Pursuant to § 1997e(e), Plaintiff is not entitled to any judgment or damages for any mental or emotional anguish.

### 2. PLAINTIFF FAILED TO EXHAUST HER ADMINISTRATIVE REMEDIES.

42 U.S.C. §1997e(a) of the Prison Litigation Reform Act ("PLRA") mandates that "[n]o action may be brought with respect to prison conditions[7] under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until

---

[7]     The PLRA does not define "prison conditions."  See 42 U.S.C. § 1997e.  Nevertheless, 18 U.S.C. §3626(g)(2) defines a "civil action with respect to prison conditions" as any civil action arising under federal law "with respect to the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison."  The Eleventh Circuit has relied upon this definition of "prison conditions" in applying the PLRA to cases before it.  See Higginbottom v. Carter, 223 F.3d 1259 (11th Cir. 2000).  It is incontrovertible that Plaintiff's allegations in this case relate solely to the "conditions of [her] confinement" at Tutwiler and, as such, trigger the application of the PLRA.

such administrative remedies as are available are exhausted." 42 U.S.C. §1997e(a).[8]   Any

remedy available under § 1983 before this Court is not available unless and until Plaintiff utilizes

the grievance process available within the correctional system.  See e.g. Brown v. Sikes, 212

F.3d 1205, 1207 (11th Cir. 2000); Miller v. Tanner, 196 F.3d 1190, 1193 (11th Cir. 1999);

Alexander v. Hawk, 159 F.3d 1321, 1325 (11th Cir. 1998); see also Higginbottom v. Carter, 223

F.3d 1259, 1261 (11th Cir. 2000) (holding that invoking the grievance process is "a pre-

condition to filing an action in federal court."); A.N.R. v. Caldwell, 111 F. Supp. 2d 1294, 1297-

99 (M.D. Ala. 2000) (dismissing prisoner's complaint for failure to exhaust administrative

remedies through the available grievance process).  The Supreme Court wrote in Porter v.

Nussle, "exhaustion is now required for all 'action [s] ... brought with respect to prison

conditions,' whether under § 1983 or 'any other Federal law.'" 534 U.S. 516, 524 (2002).

In Alexander v. Hawk, 159 F.3d 1321, 1328 (11th Cir. 1998) the Court noted:

> In summary we conclude that Section 1997 e(a) requires
> Alexander to submit his claims for monetary and injunctive relief
> to the [Federal Bureau of Prisons] available prison grievance
> program, even if the relief offered by the program does not appear
> to be "plain, speedy, and effective," before filing those claims in
> federal court.  The judicially created futility and inadequacy
> doctrines do not survive the PLRA's mandatory exhaustion
> requirement.

---

[8]     The PLRA's exhaustion requirement applies to all prisoner suits filed after April 26, 1996. See
Higginbottom v. Carter, 223 F.3d 1259 (11th Cir. 2000); Alexander v. Hawk, 159 F.3d 1321 (11th Cir. 1998).  This
requirement was specifically intended to:

> afford[ ] corrections officials time and opportunity to address complaints
> internally before allowing the initiation of a federal case . . . [because i]n some
> instances, corrective action taken in response to an inmate's grievance might
> improve prison administration and satisfy the inmate, thereby obviating the need
> for litigation . . . [and i]n other instances, the internal review might 'filter out
> some frivolous claims.'

Porter v. Nussle, 534 U.S. 516, 524-525 (2002)(citations omitted).

According to the Eleventh Circuit, a prisoner's claims must be dismissed under Rule 12(b)(1) or Rule 12(b)(6) of the Federal Rules of Civil Procedure if he has failed to exhaust his administrative remedies. Chandler, 379 F.3d at 1286.

Plaintiff did not exhaust her administrative remedies prior to the filing of this action. Plaintiff filed four Medical Complaints or informal grievances during her incarceration at Tutwiler. (Strickland Affidavit at ¶ 9; PHS0368-0370; PHS0140-0141). Responses to Plaintiff's grievances were provided in a timely manner. (Strickland Affidavit at ¶ 9; PHS0367-0371). Plaintiff did not submit any appeal after receiving a response to any Medical Complaint she filed during her incarceration at Tutwiler. (Strickland Affidavit at ¶ 9). By failing to utilize procedures available to her at Tutwiler, of which she was aware, Plaintiff failed to exhaust the administrative remedies available to her as required by the PLRA. As such, Plaintiff's Complaint is premature.

## VI.     CONCLUSION

Based on the foregoing facts and legal arguments, the Complaint filed by Plaintiff fails to state a claim against Dr. Englehardt.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **DEBRA JOYCE CLACKLER, #159516,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **2:06-CV-172-WHA** |
| **GLADYS DEESE, FRANK ALBRIGHT** | ) | |
| **and DR. SAMUEL ENGLEHARDT,** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

## ANSWER OF DEFENDANT DR. SAMUEL ENGLEHARDT

---

COMES NOW, Defendant DR. SAMUEL ENGLEHARDT ("Dr. Englehardt") and for his Answer to the Complaint filed by Plaintiff DEBRA JOYCE CLACKLER ("Plaintiff"), states as follows:

### FACTUAL ALLEGATION

1.      Dr. Englehardt is without sufficient information to form a belief as to the truth of the averments set forth on page 1, paragraphs 1 and 2 of Plaintiff's Complaint and therefore denies the same and demands strict proof thereof.

2.      Dr. Englehardt admits that Plaintiff is presently confined at Julia Tutwiler Prison for Women ("Tutwiler") and the address of Tutwiler is 8966 U.S. Highway 231, North, Wetumpka, Alabama 36092.   Dr. Englehardt denies all remaining averments on page 1, paragraph 3 of Plaintiff's Complaint and demands strict proof thereof.

3.      Dr. Englehardt admits that the address of Tutwiler is 8966 U.S. Highway 231, North, Wetumpka, Alabama, 36092.  Dr. Englehardt denies all averments on page 1, paragraph 4 of Plaintiff's Complaint and demands strict proof thereof.

4.      Dr. Englehardt is without sufficient information to form a belief as to the truth of the averments asserted against Warden Gladys Deese and Deputy Warden Frank Albright.  Dr. Englehardt denies all remaining averments on page 2, paragraph 1 of Plaintiff's Complaint and demands strict proof thereof.

5.      Dr. Englehardt denies all averments on page 2, paragraphs 2 through 6 (which continues onto page 3) of Plaintiff's Complaint and demands strict proof thereof.

6.      Dr. Englehardt admits that Plaintiff complained of abdominal pain, constipation, nausea and vomiting and that Plaintiff was diagnosed with a lipoma.  Dr. Englehardt denies all remaining averments on page 3, paragraph 1 (first full paragraph) of Plaintiff's Complaint and demands strict proof thereof.

7.      Dr. Englehardt admits that Plaintiff's medical records indicate that she was examined by Dr. John Peasant ("Dr. Peasant").  Dr. Englehardt denies all remaining averments on page 3, paragraph 2 (second full paragraph) of Plaintiff's Complaint and demands strict proof thereof.

8.      Dr. Englehardt denies all averments on page 3, paragraph 3 (third full paragraph) of Plaintiff's Complaint and demands strict proof thereof.

9.      Dr. Englehardt admits that he examined Plaintiff on August 18, 2004, and ordered a test to determine Plaintiff's levels of Amylase and Lipase (fluids which reveal whether an individual has pancreatitis).  Dr. Englehardt denies all remaining averments on page 3, paragraph 4 (forth full paragraph) of Plaintiff's Complaint and demands strict proof thereof.

10.      Dr. Englehardt denies all averments on page 3, paragraph 5 (fifth full paragraph) of Plaintiff's Complaint and demands strict proof thereof.

11.    Dr. Englehardt admits that Plaintiff's medical records indicate that she was diagnosed with a lipoma while incarcerated at South Louisiana Correctional Center under the care of Louisiana Correctional Services, Inc.  Dr. Englehardt denies all remaining averments on page 3, paragraph 6 (sixth full paragraph which continues onto page 4) of Plaintiff's Complaint and demands strict proof thereof.

12.    Dr. Englehardt denies all averments on page 4, paragraphs 1 through 3 (first three full paragraphs) of Plaintiff's Complaint and demands strict proof thereof.

13.    Dr. Englehardt admits that Plaintiff was examined by Dr. Peasant on April 12, 2005.  Dr. Englehardt is without sufficient information to form a belief as to the truth of the date Plaintiff was transported back to Tutwiler and therefore denies this averment and demands strict proof thereof.  Dr. Englehardt denies all remaining averments on page 4, paragraph 4 (forth full paragraph) of Plaintiff's Complaint and demands strict proof thereof.

14.    Dr. Englehardt denies all averments on page 4, paragraph 5 (fifth full paragraph) of Plaintiff's Complaint and demands strict proof thereof.

15.    Dr. Englehardt denies all averments on page 5, paragraph 1 of Plaintiff's Complaint and demands strict proof thereof.

16.    Dr. Englehardt admits that Plaintiff was examined by Dr. Daniel Daly ("Dr. Daly") on May 16, 2005.  Dr. Englehardt denies all averments on page 5, paragraph 2 of Plaintiff's Complaint and demands strict proof thereof.

17.    Dr. Englehardt denies all averments on page 5, paragraph 3 of Plaintiff's Complaint and demands strict proof thereof.

18.     Dr. Englehardt admits that Plaintiff had her lipoma surgically removed on June 24, 2005. Dr. Englehardt denies all averments on page 5, paragraph 4 of Plaintiff's Complaint and demands strict proof thereof.

19.     Dr. Englehardt denies all averments on page 5, paragraphs 5 and 6 (which continues onto page 6) of Plaintiff's Complaint and demands strict proof thereof.

20.     Dr. Englehardt admits evaluating Plaintiff on September 8, 2005. Dr. Englehardt denies all remaining averments on page 6, paragraph 1 (first full paragraph) of Plaintiff's Complaint and demands strict proof thereof.

21.     Dr. Englehardt admits that Plaintiff was examined by Dr. Winfred Williams ("Dr. Williams") on November 3, 2005, and scheduled for a follow-up evaluation with Dr. Englehardt to evaluate Plaintiff's perimenopausal symptoms. Dr. Englehardt denies all remaining averments on page 6, paragraph 2 (second full paragraph) of Plaintiff's Complaint and demands strict proof thereof.

22.     Dr. Englehardt admits examining Plaintiff on November 8, 2005, and prescribing Plaintiff Provera to control her vaginal bleeding. Dr. Englehardt denies all remaining averments on page 6, paragraph 3 (third full paragraph) of Plaintiff's Complaint and demands strict proof thereof.

23.     Dr. Englehardt admits that Plaintiff had a pelvic ultrasound on December 6, 2005. Dr. Englehardt denies all remaining averments on page 6, paragraph 4 (fourth full paragraph) of Plaintiff's Complaint and demands strict proof thereof.

24.     Dr. Englehardt admits that the results of the pelvic ultrasound revealed that Plaintiff had a fibroid uterus. Dr. Englehardt denies all remaining averments on page 6, paragraph 5 (fifth full paragraph) of Plaintiff's Complaint and demands strict proof thereof.

25.     Dr. Englehardt admits that Plaintiff submitted a sick call request form on January 12, 2006, complaining of abdominal and back pain, vaginal pain, nausea and vomiting.  Dr. Englehardt denies all remaining averments on page 6, paragraph 6 (which continues onto page 7) of Plaintiff's Complaint and demands strict proof thereof.

26.     Dr. Englehardt admits examining Plaintiff on January 18, 2006, and prescribing Plaintiff Provera.  Dr. Englehardt denies all remaining averments on page 7, paragraph 1 (first full paragraph) of Plaintiff's Complaint and demands strict proof thereof.

27.     Dr. Englehardt denies all averments on page 7, paragraphs 2 and 3 (second and third full paragraphs) of Plaintiff's Complaint and demands strict proof thereof.   Dr. Englehardt further objects to all relief requested by Plaintiff on page 7, paragraph 3 of Plaintiff's Complaint.

To the extent that any of the averments in the Plaintiff's Complaint have not been expressly admitted or denied, they are hereby denied.

## AFFIRMATIVE AND OTHER DEFENSES

### First Defense

Plaintiff's Complaint fails to state a claim upon which relief can be granted.

### Second Defense

Plaintiff's claims are barred by the doctrine of contributory negligence and/or last clear chance.

### Third Defense

Plaintiff's claims are barred by the doctrine of assumption of risk.

### Fourth Defense

Plaintiff's claims are barred by the doctrine of laches.

### Fifth Defense

Plaintiff's claims are barred by the statute of limitations.

## Sixth Defense

Plaintiff's claims are barred by the doctrine of waiver.

## Seventh Defense

The Court lacks subject matter jurisdiction over this dispute.

## Eighth Defense

This Court is the improper venue in which to assert this action.

## Ninth Defense

Plaintiff lacks standing to bring this action.

## Tenth Defense

Plaintiff's claims are barred by the doctrine of unclean hands.

## Eleventh Defense

Plaintiff's claims are barred by the doctrine of qualified immunity.

## Twelfth Defense

Plaintiff's claims are barred by the doctrine of sovereign immunity.

## Thirteenth Defense

Plaintiff's claims are barred by the doctrine of estoppel.

## Fourteenth Defense

Plaintiff's claims are barred by the doctrine of *res judicata* and/or collateral estoppel.

## Fifteenth Defense

Plaintiff's claims are barred, in whole or in part, because of her  failure to mitigate damages.

### Sixteenth Defense

Dr. Englehardt aver that the wrongs and damages alleged by Plaintiff were caused solely by the acts and/or omissions of person and/or entities for whom or which Dr. Englehardt was not responsible.

### Seventeenth Defense

Plaintiff's claims are barred because Dr. Englehardt did not breach any duty Defendant allegedly owed to Plaintiff.

### Eighteenth Defense

Plaintiff's claims are barred because there is no casual relationship, legal or proximate, between Dr. Englehardt's actions or failures to act and the Plaintiff's alleged injuries and damages.

### Nineteenth Defense

Plaintiff's claims are barred because of the existence of superseding, intervening causes.

### Twentieth Defense

Plaintiff's claims are barred because of the lack of damages suffered due to any of the alleged wrongs asserted against Dr. Englehardt.

### Twenty-First Defense

Plaintiff has failed to exhaust or attempt to exhaust administrative remedies.  42 U.S.C. § 1997e(a) (2005).

### Twenty-Second Defense

Plaintiff's claims are barred because the action asserted is "frivolous, malicious, and fails to state a claim upon which relief can be granted."  42 U.S.C. § 1997e(c)(1) (2005).

### Twenty-Third Defense

Plaintiff's claims are barred because no personal, physical injury has been alleged and/or suffered by Plaintiff.  42 U.S.C. § 1997e(e) (2005).

### Twenty-Fourth Defense

Plaintiff's claims are barred because the injunctive relief sought is not sufficiently narrowly drawn.  18 U.S.C. § 3626(a)(1)(A) (2005).

### Twenty-Fifth Defense

Plaintiff's claims are barred because Dr. Englehardt did not act with deliberate indifference. Estelle v. Gamble, 429 U.S. 97 (1976).

### Twenty-Sixth Defense

Plaintiff's claims are barred because of his failure to allege the existence of a serious medical condition.

### Twenty-Seventh Defense

Plaintiff's claims are barred because he is seeking to question a medical judgment via injunctive relief.

### Twenty-Eighth Defense

To the extent Plaintiff seeks to recover any attorneys' fees, Dr. Englehardt objects to any and all such requests for fees that are not asserted in the Complaint or otherwise approved by court order.

### Twenty-Ninth Defense

Plaintiff's claims for punitive damages violate Dr. Englehardt's United States and Alabama constitutional protections from, including without limitation, excessive fines, cruel and unusual punishment, denial of due process and denial of equal protection of the law.

**Thirtieth Defense**

Dr. Englehardt reserves the right to assert other defenses as discovery proceeds.

Respectfully submitted on this the 5th day of June, 2006.


*/s/ Douglas B. Hargett* _____
One of the Attorneys for Dr. Samuel Englehardt

**OF COUNSEL:**

David B. Block
William R. Lunsford
Douglas B. Hargett
BALCH & BINGHAM LLP
Post Office Box 18668
Huntsville, AL 35804-8668
Telephone: (256) 551-0171
Facsimile: (256) 512-0119


**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of Court using the

CM/ECF system and service will be perfected by e-mail to the CM/ECF participants or by

postage prepaid first class mail to the following this the 5th day of June, 2006:

Debra Joyce Clackler
AIS# 159516
JULIA TUTWILER PRISON FOR WOMEN
8966 US Highway 231 North
Wetumpka, Alabama 36092

Jeffery Harris Long
Office of the Attorney General
11 South Union Street
Montgomery, AL 36130


*/s/ Douglas B. Hargett* _____
Of Counsel